## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

　　　　　　　　　　　　　　　　　　　CASE NO. 11-20349-CR-UNGARO

　　　　　　　　Plaintiff,

v.

FERNANDO VICENTE MARULANDA TRUJILLO,

　　　　　　　　Defendant.

_____/

## EMERGENCY MOTION FOR COMPASSIONATE RELEASEDUE DUE TO MEDICAL CONDITIONS AND COVID -19 VIRUS

COMES NOW, defendant, FERNANDO VICENTE MARULANDA TRUJILLO, by and through the undersigned counsel, pursuant to Title 18 U.S.C. § 3582(c)(1)(A);(c)(2);(c)(3) and (c)(6), as amended by Section 603 of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, hereby files the instant Emergency Motion for Compassionate Release, and in support thereof proffers the following facts:

### GROUNDS FOR RELIEF

a. *Mr. Marulanda Trujillo's Age, Debilitating, Deteriorating Health Condition and the COVID-19 Pandemic*

Mr. Marulanda Trujillo is a 68 year old man who was convicted of a non-violent, drug trafficking offense on July 30, 2012, approximately 8 years ago.  Mr. Marulanda Trujillo has no history of violence and no other criminal convictions.  According to the BOP website, if Mr. Marulanda Trujillo survives the COVID-19 pandemic, he will be released on December 11, 2026. **(See https://www.bop.gov/inmateloc/).**  As documented by the Federal Bureau of Prisons, Mr. Marulanda Trujillo suffers from severe coronary heart disease, heart failure, chronic atrial

1

fibrillation, severe mitral valve regurgitation, multi-vessel coronary artery disease, chronic diastolic heart failure, and iron deficiency. (**Ex. 1).**  While serving his federal prison sentence, Mr. Marulanda Trujillo suffered a heart attack, among other things, and was actually found passed out on the shower floors. (**Ex. 1).**  Mr. Marulanda Trujillo has  undergone a myriad of very serious surgeries while incarcerated, including but not limited to cardiac bypass surgery, as well as open heart surgery, during which time a dual chamber permanent pacemaker was inserted. (**Ex. 2**).  Mr. Marulanda Trujillo was once again recently hospitalized on February 23, 2020, through February 27, 2020,  and was found to have accumulated water in or about his heart cavity, and was only released shortly before the COVID-19 pandemic arrived to the United States.  As evidenced by the attached medical records, Mr. Marulanda Trujillo, now 68, suffers from heart failure, chronic atrial fibrillation, severe mitral valve regurgitation, multivessel coronary artery disease, chronic diastolic heart failure, iron deficiency, hypertension and hyperlipidemia.  (**Ex. 1**)

Mr. Marulanda Trujillo continues to experience deteriorating physical health, the latter which substantially diminish his ability to provide self-care within the prison environment, and he is not expected to recover from his health condition, but rather continues to deteriorate.

### b.  The COVID-19 Pandemic

COVID-19 has spread all over the world and has greatly impacted us all.   The United States reported more confirmed cases than any other country, with  the Center for Disease Control reporting over 300,000 on April 5, 2020.[1] As the United States has experienced a shortage of COVID-19 tests, there is reason to believe that there are many more unconfirmed cases in addition to the 300,000 confirmed cases. The COVID-19 pandemic poses a serious danger to society, and especially to at-risk or vulnerable inmates. COVID-19 poses a greater threat to Federal Bureau of Prison inmates than to the  general  population  because inmates are confined in relatively close quarters and are

unable to take the health precautions that many can take outside of prison, such as social distancing. In light of this unprecedented situation, on April 3, 2020, Attorney General Barr urged the Federal Bureau of Prisons to transfer inmates to home confinement where appropriate to decrease the risks to their health. Memorandum from the Attorney General (Apr. 3, 2020). The memorandum states that inmates over 60 years of age with severe pre-existing medical conditions serving sentences for non-violent crimes may be transferred to home confinement. (*Id*. at 2.) Attorney General William Barr also emphasized the importance of protecting the public from individuals who may pose a danger to society and to prevent the over-burdenin of the police force "with the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released." (*Id*. at 3.) The memorandum also stresses the need for careful, individualized determinations on the appropriateness of releasing any given inmate and does not encourage a mass release of all qualifying inmates. (*Id*.)

According to the Centers for Disease Control, COVID-19 spreads from person to person:

- Through respiratory droplets produced when an infected person coughs, sneezes or talks.
- These droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs.
- Between people who are in close contact with one another (within about 6 feet).
- Some recent studies have suggested that COVID-19 may be spread by people who are not showing symptoms.
- Maintaining good social distance (about 6 feet) is very important in preventing the spread of COVID-19.
- It may be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes. This is not thought to be the main way the virus spreads, but we are still learning more about this virus. CDC recommends people practice frequent "hand hygiene," which is either washing hands with soap or water or using an alcohol-based hand rub. CDC also recommends routine cleaning of frequently touched surfaces.
- How easily a virus spreads from person-to-person can vary. Some viruses are highly contagious, like measles, while other viruses do not spread as easily. Another factor is whether the spread is sustained, which means it goes from person-to-person without stopping.

3

- The virus that causes COVID-19 is spreading very easily and sustainably between people.
- Information from the ongoing COVID-19 pandemic suggest that this virus is spreading more efficiently than influenza, but not as efficiently as measles, which is highly contagious.
- COVID-19 is thought to spread mainly through close contact from person-to-person in respiratory droplets from someone who is infected.  People who are infected often display symptoms of illness.  Some people, however, are without symptoms although they are infected and may be able to spread the virus.  See Centers for Disease Control information at:        https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html

Inmates housed in the state, federal, and juvenile justice prison system DO NOT have the ability to put in place the measures aimed at preventing the spread of COVID-19 as a result of their housing conditions.  Given his housing conditions, Mr. Marulanda Trujillo cannot exercise social distancing as mandated by the Center for Disease Control.  The Federal Bureau of Prisons has only recently provided inmates with a surgical type mask that is not an N95 mask or it's equivalent, and is therefore not sufficient to protect Mr. Marulanda Trujillo from contracting COVID-19.

The Federal Bureau of Prisons has additionally and inexplicably, reduced Mr. Marulanda Trujillo's commissary amount by1/2, to $25 per week, versus $250.00 per month.  Hence, Mr. Marulanda Trujilo cannot purchase soap, shampoo, toothpaste, laundry detergent, or food and has barely enough to subsist.  It is unknown why the Federal Bureau of Prisons has cut the commissary accounts of all inmates.  The Federal Bureau of Prisons does not provide Mr. Marulanda Trujillo with hand sanitizer, rubbing alcohol, Clorox, or soap. The Federal Bureau of Prisons has not segregated Mr. Marulanda Trujillo given his age and serious deteriorating physical condition. Fort Dix FBOP, which houses Mr. Marulanda Trujillo, has not only made it impossible for Mr. Marulanda Trujillo to exercise social distancing, but the FBOP have effectively made it impossible for Mr. Marulanda Trujillo to take the necessary and required steps set forth by the Centers for Disease Control to protect himself from contracting COVID-19.

 The Federal Bureau of Prisons continue to move inmates from prison to prison, and the prison guards continue to have hands-on contact with all of the inmates, including pat downs and the

4

like.  On April 7, 2020, a federal prison inmate being housed at Fort Dix Federal Prison tested positive for  COVID-19.(See  https://www.nj.com/coronavirus/2020/04/first-inmate-at-federal-prison-in-nj-tests-positive-for-coronavirus.html).  Mr. Marulanda Trujillo is only permitted to bathe 3 times per week, and does not have access to the computers, and phone access is not only limited, but very dangerous given that the FBOP does not wipe the prison phones clean after every use.  Mr. Marulanda Trujillo has been cut off from the world and cannot contact the Warden or this Honorable Court.

On March 22, 2019, Mr. Marulanda Trujillo filed a request for compassionate release with the warden of FCI Fort Dix. **(Ex. 3).**  The Warden denied Movant's request  on June 14, 2019, because Movant did not meet the criteria for "Elderly Inmates with Medical  Conditions" due to his having served only 42.2% of his sentence. **(Ex. 4)** (D.E. 57-10, 57-11.)   Given the COVID-19 pandemic, on April 1, 2020, Mr. Marulanda Trujillo once again petitioned the Warden for a compassionate  release,  however,  the  Warden  has  not  yet  responded. **(Ex. 8)** Mr. Marulanda Trujillo's age (68), his continued medical decline, his pre-existing medical conditions, his inability to shelter in place or otherwise practice social distancing given the FBOP's housing conditions at FCI Fort Dix, his inability to have access to the necessary N95 mask, hand sanitizer, soap, rubbing alcohol, Clorox, his inability to bathe on a daily basis, or do laundry, place Mr. Marulanda Trujillo in the highest risk of death if he were to contract COVID-19.  Even worse, there is no testing available to inmates before the symptoms make clear the disease has stricken and the FBOP is not conducting "contact tracing" in order to be more readily able to notify Mr. Marulanda Trujillo long beforehand, that he may have been exposed to COVID-19.

Based  upon  the  foregoing  "extraordinary  and  compelling"  circumstances  warranting compassionate release, Mr. Marulanda Trujillo now seeks a reduction of his sentence pursuant to Title 18 U.S.C. § 3582(c)(2);(c)(3) and (c)(6), as amended by Section 603 of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194.

## PROCEDURAL BACKGROUND

On May 19, 2011, Mr. Marulanda Trujillo was indicted and charged with conspiracy to distribute five (5) kilograms or more of cocaine, knowing that such substance would be unlawfully imported into the United States, in violation of Title 21, United States Code, Section 963. **(DE# 1)** Immediately upon learning of his indictment and before he was arrested, on January 12, 2012, Mr. Marulanda Trujillo self-surrendered to the United States, Southern District of Florida, and did not make the Department of Justice go through the added expense of extraditing Mr. Marulanda Trujillo. On January 13, 2012, attorney Nelson Israel Alfaro filed a Notice of Appearance on his behalf. **(DE# 4)** Without filing a single pre-trial motion, and without obtaining or reviewing any discovery, on February 27, 2012, Mr. Marulanda Trujillo entered a guilty plea to the charges set forth in the Indictment. **(DE# 16; 17; and18).**

Mr. Marulanda Trujillo was sentenced to 210 months on July 30, 2012. **(DE#28).** Mr. Marulanda Trujillo did not file a direct appeal. On March 16, 2015, Mr. Marulanda Trujillo filed a Motion to Reduce Sentence pursuant to U.S.S.C. Amendment 782, Title18 U.S.C. §3582 (c)(2) and requested a reduction of his term of imprisonment based on a guideline sentencing range that was subsequently lowered and made retroactive by the United States Sentencing Commission pursuant to 28 U.S.C. §994(u). **(DE# 52).** This Honorable Court denied the latter motion on June 10, 2016. **(DE#54).** On July 24, 2019, Mr. Marulanda Trujillo petitioned the Court for a modification of his sentence consistent with the mandates of the First Step Act, and sought a reduction of his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), as amended by Section 603 of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, given his declining health condition. **(DE# 57).** On August 13, 2019, this Honorable Court denied Mr. Marulanda's First Step Act motion because the Court determined  Mr. Marulanda Trujillo had not served 75% of his sentence, nor had he served ten (10) years, whichever is shorter, and the Court likewise determined Mr. Marulanda Trujillo did not claim

that he fully exhausted all administrative rights to appeal the BOP's failure to bring a motion on his

behalf or provide documentation of such, nor did he assert that the BOP failed to act after he made a

request. **(DE#61)**

## MEMORADUM OF LAW

### Compassionate Release Statute

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), provides

that:

> (A)    the court, upon motion of the Director of the Bureau of Prisons,
> or upon motion of the defendant after the defendant has fully
> exhausted all  administrative  rights to appeal a failure of the Bureau
> of Prisons to bring a motion on the defendant's behalf or the lapse of
> 30 days from the receipt of such a request by the warden of the
> defendant's facility, whichever is earlier, may reduce the term of
> imprisonment (and may impose a term  of probation or supervised
> release with or without conditions that does not exceed the unserved
> portion of the original term of imprisonment), after considering the
> factors set forth in section 3553(a) [18 USCS § 3553(a)] to the extent
> that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in
> prison, pursuant to a sentence imposed under section 3559(c), for the offense
> or offenses for which the defendant is currently imprisoned, and a
> determination has been made by the Director of the Bureau of Prisons that
> the defendant is not a danger to the safety of any other person or the
> community, as provided under section 3142(g);
>
> 18 U.S.C. § 3582(c)(1)(A)(i)

Federal courts may reduce a prisoner's sentence under the circumstances outlined in 18 U.S.C.

§ 3852(c). Under § 3852(c)(1)(A)(i), a court may reduce a prisoner's sentence "if it finds that" (1)

"extraordinary and compelling reasons warrant such a reduction" and (2) the reduction is "consistent

with applicable policy statements issued by the Sentencing Commission." Prior to 2018 only the

Director of the Bureau of Prisons ("BOP") could file these kinds of "compassionate release motions."

United States v. Brown, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019).

The BOP rarely did so. The BOP was first authorized to file compassionate release motions in 1984. From 1984 to 2013, an average of only 24 inmates were released each year through BOP-filed motions. *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice). According to a 2013 report from the Office of the Inspector General, these low numbers resulted, in part, because the BOP's " compassionate release program had been poorly managed and implemented inconsistently, ... resulting in eligible inmates... not being considered for release, and terminally ill inmates dying before their requests were decided." *Id.* The report also found that the BOP "did not have clear standards as to when compassionate release is warranted and ... BOP staff therefore had varied and inconsistent understandings of the circumstances that warrant consideration for compassionate release." *Id.*

Against this backdrop, Congress passed and President Trump signed the First Step Act in 2018, a landmark piece of criminal-justice reform legislation that "amend[ed] numerous portions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration." Brown, 411 F. Supp. 3d at 448 (citing Cong. Research Serv., R45558, *The First Step Act of 2018: An Overview* 1 (2019)). In an effort to improve and increase the use of the compassionate release process, the First Step Act amended § 3852(c)(1)(A) to allow prisoners to directly petition courts for compassionate release, removing the BOP's exclusive "gatekeeper" role. Congress made this change in § 603(b) of the First Step Act. Section 603(b)'s purpose is enshrined in its title: "Increasing the Use and Transparency of Compassionate Release" Section 603(b) was initially a standalone bill that "explicitly sought to 'improve the compassionate release process of the Bureau of Prisons.' " Brown, 411 F. Supp. 3d at 451 (quoting Granting Release and Compassion Effectively Act of 2018, S. 2471, 115th Cong. (2018)).

The amendment to § 3852(c)(1)(A) provided prisoners with two direct routes to court: (1) file a motion after fully exhausting administrative appeals of the BOP's decision not to file a motion, or (2) file a motion after "the lapse of 30 days from the receipt ... of such a request" by the warden of the defendant's facility, "whichever is earlier." 18 U.S.C. § 3852(c)(1)(A). These changes gave the "district judge ... the ability to grant a prisoner's motion for compassionate release even in the face of BOP opposition or its failure to respond to the prisoner's compassionate release request in a timely manner." United States v. Young, 2020 WL 1047815, at *5 (M.D. Tenn. Mar. 3, 2020). The substantive criteria of § 3582(c)(1)(A)(i) remained the same.

Congress never defined the term "extraordinary and compelling reasons," except to state that "[r]ehabilitation ... alone" does not suffice. 18 U.S.C. § 994(t). Rather, Congress directed the Sentencing Commission to define the term. *Id.* The Commission did so prior to the passage of the First Step Act, but has not since updated the policy statement. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)-(D). In subsections (A)-(C) of an Application Note to U.S.S.G. § 1B1.13, the Commission enumerated three specific "reasons" that qualify as "extraordinary and compelling": (A) terminal illness diagnoses or serious medical, physical or mental impairments from which a defendant is unlikely to recover, and which "substantially diminish" the defendant's capacity for self-care in prison; (B) aging-related health decline where a defendant is over 65 years old and has served at least ten years or 75% of his sentence; or (C) two family related circumstances: (i) death/incapacitation of the only caregiver for the inmate's children or (ii) incapacitation of an inmate's spouse, if the inmate is the spouse's only caregiver. *See id.* cmt. n.1(A)-(C). The policy statement also added a catchall provision that gave the Director of the BOP the authority to determine if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with" the other three categories. *Id.* cmt. n.1(D).

9

Thus, implicitly recognizing that it is impossible to package all "extraordinary and compelling" circumstances into three neat boxes, the Commission made subsections (A)-(C) non-exclusive by creating a catchall that recognized that other "compelling reasons" could exist. *See* United States v. Urkevich, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) (noting that § 1B1.13 never "suggests that [its] list [of criteria] is exclusive"); United States v. Beck, --- F. Supp. 3d ----, 2019 WL 2716505, at 8 (M.D.N.C. June 28, 2019) ("Read as a whole, the application notes suggest a flexible approach ... [and] recognize that the examples listed in the application note do not capture all extraordinary and compelling circumstances.").

The Commission has not updated its policy statement to account for the changes imposed by the First Step Act, and the policy statement is now clearly outdated. The very first sentence of § 1B1.13 constrains the entire policy statement to motions filed solely by the BOP. And an Application Note also explicitly confines the policy statement to such motions. *See* U.S.S.G. § 1B1.13 ("Upon motion of the Director of the [BOP] ... the court may reduce a term of imprisonment ...."); *id.* at cmt n.4 ("A reduction under this policy statement may be granted only upon motion by the Director of the [BOP]."); *see also* Brown at 449 (describing the old policy statement as "outdated," adding that the Commission "has not made the policy statement for the old [statutory] regime applicable to the new one."); United States v. Ebbers, --- F. Supp. 3d ----, 2020 WL 91399, at 4 (S.D.N.Y. 2020) (describing the old policy statement as "at least partly anachronistic").

Accordingly, a majority of district courts have concluded that the "old policy statement provides helpful guidance, [but] ... does not constrain [a court's] independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3852(c)(1)(A)." United States v. Beck, --- F. Supp. 3d ----, No. 13-cr-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019); *see also* Brown, 411 F. Supp. 3d at 451 ("[T]he most natural reading of the amended § 3582(c)

... is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion  properly before it."); United States v. Fox, 2019 WL 3046086, at 3 (D. Me. July 11, 2019) ("[D]eference to the BOP no longer makes sense now that the First Step Act has reduced the BOP's role."); United States v. Redd, 2020 WL 1248493, at 7 (E.D. Va. Mar. 16, 2020) ("Application Note 1(D)'s prefatory language, which requires a [catchall] determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance.... [R]estricting the Court to those reasons set forth in § 1B1.13 cmt. n.1(A)-(C) would effectively preserve to a large extent the BOP's role as exclusive gatekeeper, which the First Step Act substantially eliminated ...."); United States v. Young, 2020 WL 1047815, at (M.D. Tenn. Mar. 4, 2020) ("[T]he dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act."); Maumau, 2020 WL at 2-3 (D. Utah Feb. 18, 2020) (collecting cases).

The conclusion reached by the majority of courts is more persuasive. It is true that § 3852(c)(1)(A) requires courts to act consistently with *applicable* policy statements under the Sentencing Guidelines, but the Sentencing Commission simply has not issued a policy statement that addresses prisoner-filed motions post-First Step Act.

There is no policy statement applicable to motions for compassionate release filed by defendants under the First Step Act. By its terms, the old policy statement applies to motions filed by the [BOP] Director and makes no mention of motions filed by defendants.... The Sentencing Commission has not amended or updated the old policy statement since the First Step Act was enacted, nor has it adopted a new policy statement applicable to motions filed by defendants. Beck, --- F. Supp. 3d ----, 2019 WL 2716505, at 5 (citations omitted). The introductory sentence of §

1B1.13, "*[u]pon motion of the Director of the [BOP ... the court may reduce a term of imprisonment*," limits the policy statement's scope to a procedural scheme exclusively involving the BOP that does not exist anymore. And comment 4 of § 1B1.13's Application Note expressly states that "[a] reduction *under this policy statement may be granted only upon motion by the Director of the [BOP].*" Accordingly, by its own terms, the scope of the old policy statement is clearly outdated and, at the very least, does not apply to the entire field of post-First Step Act motions. In other words, for prisoner-filed motions, there is a gap left open that no "applicable" policy statement has addressed. Therefore, the policy statement may provide "helpful guidance" but does not limit the Court's independent assessment of whether "extraordinary and compelling reasons" exist under § 3582(c)(1)(A)(i). *See* <u>Beck</u> at 6; <u>Fox</u>, 2019 WL 3046086, at 3 ("I agree with the courts that have said that the Commission's existing policy statement provides helpful guidance ... [but] is not ultimately conclusive given the statutory change.").

Minority cases like <u>Lynn</u> attempt to refute this point by minimizing the impact of the First Step Act's changes. See <u>Lynn</u>, 2019 WL 38505349, at 4 n.5 ("While Section 1B1.13 and application note 4 reference motions brought by BOP, this merely restates the restriction on proper movants [that existed] prior to the [First Step] Act ...."). The First Step Act, however, significantly altered the landscape of compassionate-release motions and created a procedural gap that the Sentencing Commission's policy statement never had a chance to address. When the Commission wrote its policy statement, a motion could reach the court only through the BOP. By providing the catchall provision, the Commission recognized that it may be impossible to definitively predict what reasons may qualify as "extraordinary and compelling." Rather than attempt to make a definitive prediction, the Commission covered all of its bases by ensuring that every motion to reach the court would have an opportunity to be assessed under the flexible catchall provision. At the time the Commission wrote,

the catchall provision's BOP-focused language accomplished that task, because every motion to reach the court necessarily had to be filed and approved by the BOP.

Under the First Step Act, however, it is possible for inmates to file compassionate-release motions—under the 30-day lapse provision—when their warden *never* responds to their request for relief. Thus, Congress specifically envisioned situations where inmates could file direct motions in cases where nobody in the BOP *ever* decided whether the motion qualified for relief under the catchall provision that the Commission originally sought to apply to *all* motions.  It would be a strange remedy indeed if Congress provided that prisoners whose wardens failed to respond in such a situation could only take advantage of the thirty-day lapse provision by accepting a pared-down standard of review that omitted the flexible catchall standard. But under the minority view, that is exactly what would happen: prisoners in this situation would never have the chance for the BOP to assess their claim under the catchall provision and would never get the chance for this kind of flexible review in the district court, since under the minority view, the court would be constrained to the specific criteria in subsections (A)-(C) of the policy statement.

This would have the perverse effect of penalizing prisoners who take advantage of the First Step Act's fast-track procedures and rewarding prisoners who endure the BOP-related delay that the Act sought to alleviate.  That would be antithetical to the First Step Act. The First Step Act—and the critical 30-day lapse route it provided—directly responded to a compassionate-release system so plagued by delay that prisoners sometimes died while waiting for the BOP to make a decision. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice); *see also* 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018)(statement of Senator Cardin, co-sponsor of First Step Act) ("[T]he bill expands compassionate release ... and expedites compassionate release

applications."). Under the minority view, Congress would have created a two-tiered system that poses a Sophie's Choice to prisoners with unresponsive wardens: (1) opt for quicker relief at the cost of a disadvantageous standard with no catchall; or (2) endure delay—and, possibly, complete inaction—to retain a more flexible standard. Congress sought to help, not hinder, these sorts of prisoners, and clearly did not intend to create this outcome. Nothing in the text of the old policy statement calls for it, since that statement expressly limits itself to motions filed by the BOP and was written before this situation was even possible to envision.

Adopting the minority view, then, would undermine the purpose of the First Step Act and create an inconsistent and shifting definition of the term "extraordinary and compelling." Because the Sentencing Commission has not issued a policy statement addressing post-First Step Act procedures, it certainly has not mandated that courts take such an approach. Accordingly, as a result of the First Step Act, there is simply a procedural gap that the Sentencing Commission—currently lacking a quorum and unable to act—has not yet had the chance to fill. Nothing in § 3852(c)(1)(A)(i) requires courts to sit on their hands in situations like these. Rather, the statute's text directly instructs courts to "find that" extraordinary circumstances exist.

Therefore, this Honorable Court has discretion to assess whether Mr. Marulanda Trujillo presents "extraordinary and compelling reasons" for his release outside of those listed in the non-exclusive criteria of subsections (A)-(C) of the old policy statement. Of course, this policy statement remains informative in guiding my determination. *See*, e.g., <u>Fox</u>, 2019 WL 3046086, at 3 ("[T]he Commission's existing policy statement provides helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive ...."); <u>Beck</u>, 2019 WL 2716505, at 7 ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment ...."); <u>United States v. Lisi,</u> 2020 WL 881994, at 3 (S.D.N.Y. Feb. 24, 2020)

("[T]he Court may independently evaluate whether [defendant] has raised an extraordinary and compelling reason for compassionate release ... [but § 1B1.13's policy statement] remain[s] as helpful guidance to courts ....").

Hence, this Honorable Court may waive the requirement that an inmate exhaust all administrative remedies only if one of the recognized exceptions to exhaustion applies. "Even where exhaustion is seemingly mandated by statute ..., the requirement is not absolute." Washington v. Barr, 925 F.3d 109, 118 (2d Cir. 2019) (citing McCarthy v. Madigan, 503 U.S. 140, 146–47 (1992)). There are three circumstances where failure to exhaust may be excused: "First, exhaustion may be unnecessary where it would be futile, either because agency decisionmakers are biased or because the agency has already determined the issue." Id. Second, "exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief." Id. at 119. Third, "exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice." Id.

All three of these exceptions apply here. "[U]ndue delay, if it in fact results in catastrophic health consequences--in Mr. Marulanda Trujillo's case it will more than likely result in death if he contracts COVID-19—could make exhaustion futile. Moreover, the relief the agency might provide could, because of undue delay, become inadequate.  As an example, when Mr. Marulanda Trujillo sent his initial request for compassionate release to the Warden, it took the Warden approximately 3 months to even respond.  **(See Ex. 3 and Ex. 4).**  Finally, and obviously, Mr. Marulanda Trujillo could be unduly prejudiced by such delay." Washington, 925 F.3d at 120–21; *see also* Bowen v. City of New York, 476 U.S. 467, 483 (1986)(holding that irreparable injury justifying the waiver of exhaustion requirements exists where "the ordeal of having to go through the administrative process may trigger a sever medical setback" (internal quotation marks, citation, and alterations omitted)); Abbey v. Sullivan, 978 F.2d 37, 46 (2d Cir. 1992) ("[I]f the delay attending exhaustion would subject

claimants to deteriorating health, ... then waiver may be appropriate."); <u>New York v. Sullivan</u>, 906 F.2d 910, 918 (2d Cir. 1990)(holding that waiver was appropriate where "enforcement of the exhaustion requirement would cause the claimants irreparable injury" by risking "deteriorating health, and possibly even ... death"). Here, even a few weeks' delay carries the risk of catastrophic health consequences for Mr. Marulanda Trujillo. This Honorable Court should therefore find that requiring Mr. Marulanda Trujillo to require him to exhaust his administrative remedies—i.e. by either filing an appeal of the denial of his first request for compassionate release, or to alternatively require Mr. Marulanda Trujillo to wait for the Warden to respond to his most recent request, given these unique circumstances created by the COVID-19 and the exigency of a rapidly advancing pandemic, would result in undue prejudice and render exhaustion of the full BOP administrative process both futile and inadequate.

This Honorable Court should also consider the applicable 18 U.S.C. § 3553(a) factors that it would have considered at the time of sentencing, such as the nature and circumstances of the offense and the history and characteristics of the offender, *see* § 3553(a)(1), coupled with the need to ensure adequate punishment, deterrence, and community protection, *See* <u>id</u>. at (a)(2)(A-C), and to avoid unwarranted disparity, *see id.* at (a)(6), warranted a sentence of 100 months of imprisonment. However, given that Mr. Marulanda Trujillo has served the majority of his sentence and would soon be released from prison coupled with his severe medical conditions, continued confinement in prison for the last few years of his life does not serve the purposes of punishment under § 3553(a)(2). Every day that Mr. Marulanda Trujillo spends in prison, he is at risk of  contracting COVID-19 and subsequently dying from the disease.

Many district courts have recently exercised their expanded jurisdiction to release the convicted in light of the COVID-19 pandemic and unrelated medical issues. *See* U.S. v. Foster, No. 1:14-cr-324-02 (MD Pa. Apr. 3, 2020) ("the circumstances faced by our prison system during this highly contagious, potentially fatal global pandemic re unprecedented. It is no stretch to call this environment 'extraordinary and compelling' and we believe that should we not reduce defendant's sentence, defendant has a high likelihood of contracting COVID-19 form which he would "not be expected to 'recover." USSG sect 1B1 .13. No rationale is more compelling or extraordinary/"); U.S. v. Resnik, No. 1:12-cr-00152- CM (SDNY Apr. 2, 2020)("Releasing a prisoner who is for all practical purposes deserving of compassionate release during normal times is all but mandated in the age of COVID-19."); U.S. v. Williams, No. 3:04-cr-95 (MCR)(ND Fla. Apr. 1, 2020)("Williams health conditions taken with his age put him at significant risk for even more severe and life threatening illness: should he be exposed to COVID-19 while incarcerated; See U.S. v. Colvin, No. 3:19-cr-179 (JBA), 2020 WL 1613943 (D.Conn. Apr. 2, 2020)("she has diabetes, a serious medical condition, which substantially increases her risk of severe illness is she contracts COVID-19. Defendant is unable to provide self-care within the environment of FDC Philadelphia in light of the ongoing and growing COVID-19 pandemic because she is unable to practice effective social distancing and hygiene to minimize her risk to exposure. The Court concludes that the risk faced by defendant will be minimized by her immediate release to home, where she will quarantine herself.")

## COVID-19 CASES AKIN TO MR. MARULANDA TRUJILLO'S WHICH HAVE BEEN DECIDED IN THE SOUTHERN DISTRICT OF FLORIDA

- **United States of America v. Donald Platten**, Case No. 08-80148-CR MIDDLEBROOKS: The Honorable Judge Middlebrooks granted Mr. Platten's Pro Se Motion for Compassionate Release. **(Ex. 5)** On August 21, 2009, a jury convicted Mr. Platten of conspiracy, securities fraud, and obstruction of the internal revenue laws. Defendant Platten was subsequently sentenced to 262 months imprisonment. Mr. Platten is currently set to be released on April 23, 2028. *See* Federal Bureau of Prisons, Inmate Locator, available at http://www.bop.gov

/iloc2/LocateInmate.jsp. Defendant is 69 years old and suffers from prostate cancer and he has a heart condition, which required surgery and the placement of three stints. Defendant Platten also had multiple surgeries for blockage of his urethra. Mr. Platten did not exhaust his administrative remedies, as he had only sent a letter to the Warden on March 24, 2020, and 30 days had not yet elapsed. The Court nevertheless determined Mr. Platten was not required to exhaust his administrative remedies in order for the Court to have jurisdiction, relying on the holding in McCarthy v. Madigan, 503 U.S. 140, 146 (1992); *see also* Washington v. Barr, 925 F.3d 109, 118 (2d Cir. 2019), where the United States Supreme Court held that, even in such circumstances, an exception exists where "the interests of the individual weigh heavily against requiring administrative exhaustion." Id. Judge Middlebrooks found that one such exception exists where "requiring resort to the administrative remedy may occasion undue prejudice to subsequent assertion of a court action. Such prejudice may result, for example, from an unreasonable or indefinite timeframe for administrative action." McCarthy, 503 U.S. at 146–47 (1992). **(Ex. 5)**

The Honorable Judge Middlebrooks emphasized the COVID-19 virus is highly contagious and can be spread even by asymptomatic carriers.4 The virus is "spread mainly from person-to-person . . . [b]etween people who are in close contact with one another . . . [t]hrough respiratory droplets produced when an infected person coughs or sneezes."5 "Courts around the country have recognized that the risk of COVID-19 to people held in jails and prisons 'is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected.'" *See United States v. Williams,* 2020 WL 1751545, at *2 (N.D. Fla. Apr. 1, 2020) (quoting *Basank v. Decker*, --- F. Supp. 3d ---, 2020 WL 1481503, at *3 (S.D.N.Y. March 26, 2020), and citing *United States v. Harris*, --- F. Supp. 3d ---, 2020 WL 1503444, at ¶ 7 (D.D.C. Mar. 27, 2020)); *United States v. Campagna*, 2020 WL 1489829, at *2 (S.D.N.Y. Mar. 27, 2020); *Castillo v. Barr*, 2020 WL 1502864, at *2 (C.D. Cal. Mar. 27, 2020); *United States v. Kennedy*, 2020 WL 1493481, at *2-3 (E.D. Mich. Mar. 27, 2020); *United States v. Garlock*, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020)). **(Ex. 5)**

Judge Middlebrooks likewise held that given the unprecedented COVID-19 virus, it would unduly prejudice the Defendant to require him to exhaust administrative remedies, and noted: "Each day that Defendant spends in confinement, he is at a heightened risk of contracting the COVID-19 virus. Delaying a ruling on Defendant's motion until such time as the Bureau of Prisons can consider his circumstances and take action would be unreasonable and would expose Defendant to unnecessary risk. Accordingly, I find that it is appropriate to allow Defendant to proceed despite his failure to exhaust administrative remedies." **(Ex. 5 at P. 5).** Judge Middlebrooks then determined Defendant Platten had demonstrated extraordinary and compelling reasons justifying his immediate release under Section 3582(c)(1)(A) and U.S.S.G. § 1B1.13. In so doing, Judge Middlebrooks found Defendant's serious and substantial preexisting medical issues, combined with his age, placed him at increased risk of severe illness if he contracts COVID-19. *See* United States v. Rodriguez, No. 2:03-cr-271, Doc. # 135 at 2 (E.D.P.A. Apr. 1, 2020) (granting compassionate release because for a diabetic inmate, "…[n]othing could be more extraordinary and compelling than this pandemic").

According to Judge Middlebrooks:

"As the COVID-19 pandemic continues to pose a substantial threat to individuals across this country, with thousands of Americans dying each week,6 I find that Plaintiff will be able to substantially reduce his risk of contracting this virus by sheltering in his home."

*See CDC, Coronavirus Disease 2019 (COVID-19), Provisional Death Counts for Coronavirus Disease*, April 17, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

And, based on the Defendant's non-violent crime, Judge Middlebrooks found the Defendant was not a danger to the safety of any other person or to the community, and thus the factors set forth in 18 U.S.C. § 3553(a) weighed in favor of his release. **(Ex. 5)**

**United States v. Oreste,** Case No. 1:14-cr-20349-RNS-1,  (S.D. Fla. Apr. 6, 2020) (Judge Scola): Defendant filed a motion requesting that he be released from prison early and allowed to serve the remainder of his sentence in home confinement because of the extraordinary and compelling circumstances presented by the COVID-19 pandemic and because of his advanced age and incredibly poor health. **(Ex. 6)** In July 2014, Defendant Oreste pled guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. On February 4, 2015, the District Court sentenced Mr. Oreste to 100 months in prison followed by 5 years of supervised release. Mr. Oreste surrendered to serve his sentence on March 20, 2015, and has been incarcerated since then. Mr. Oreste has served 60 months of his 100-month sentence, and according to the Bureau of Prisons website, his projected release date is June 2022.

Mr. Oreste suffers from a number of severe illnesses that increase his risk of death due to COVID-19, including end-stage renal failure, heart failure, diabetes, and a history of respiratory illness. Since he was admitted into prison, he had several eye surgeries for detached retinas and is blind in his right eye and has low vision in his left eye. He had open-heart surgery in January 2017 due to a heart attack, after which he was diagnosed with heart failure. **(Ex. 6)** And, in 2018, he contracted pneumonia and bronchitis. The Honorable Judge Scola found that these medical conditions put Mr. Oreste at a high risk of death from COVID-19.2 **(Ex. 6)**. Based on the increased risk of death posed by COVID-19 pandemic and Mr. Oreste's severe health conditions, the Honorable Judge Scola found that extraordinary and compelling reasons warrant Mr. Oreste's release. **(Ex. 6)**.

**United States v. Dalia Hernandez,** Case No. 18-cr-20474, (S.D. Fla. Apr. 2, 2020): Defendant Dalia Hernandez, convicted of medicare fraud, sought a compassionate release because she is a breast cancer survivor whose weakened immune system made her susceptible to COVID-19. The Honorable Judge Cecilia Altonaga agreed and on April 2 ordered that she be allowed to finish her sentence on home confinement — with a 2-week self-quarantine from other family members. **(Ex. 7)**

## COVID-19 INFECTS THE FEDERAL BUREAU OF PRISONS POPULATION

It is becoming clear that the BOP's facilities and staff are facing a tidal wave of

infections because the BOP houses a large number of prisoners in very tight quarters across this nation. Once the virus spreads inside BOP facilities, there will be little to stop it. BOP has decided as a policy matter to battle this virus by treating the prisons as fortifications that will nominally deny entry to outside infestation by among other things, ending inmate visitation and requiring the Staff to self-report infections. *See* https://www.bop.gov/coronavirus/covid19_status.jsp.

While the BOP's strategy certainly is well intentioned, it flies in the face of every health expert and governmental order in the country. Indeed, on Sunday, March 22, the President of the United States discussed openly that he is considering releasing all federal prisoners who are elderly and non-violent, presumably based on recommendations received by his Coronavirus Task Force. *See* https://www.businessinsider.com/trump-consider-coronavirus-executive-order-federal-prisons2020-3.BOP's "Impenetrable Fortress" strategy is not going to work. Staff, both symptomatic and non-symptomatic has contracted the virus and unintentionally introduces that virus within the inmate population.

**PANDEMIC WITHIN THE FEDERAL BUREAU OF PRISONS**

BOP-Reported Positive Tests for COVID-19 Nationwide

| Date | Number of Positive Inmates | Number of Positive Staff | Number of Inmate Deaths |
|---|---|---|---|
| 4/1/2020 | 57 | 37 | 3 |
| 4/2/2020 | 75 | 39 | 6 |
| 4/3/2020 | 91 | 50 | 7 |
| 4/4/2020 | 120 | 54 | 8 |
| 4/5/2020 | 138 | 59 | 8 |
| 4/6/2020 | 195 | 63 | 8 |
| 4/7/2020 | 241 | 72 | 8 |
| 4/8/2020 | 272 | 105 | 8 |
| 4/9/2020 | 283 | 125 | 8 |
| 4/10/2020 | 318 | 163 | 9 |
| 4/11/2020 | 335 | 185 | 9 |
| 4/12/2020 | 352 | 189 | 10 |
| 4/13/2020 | 388 | 201 | 13 |

| 4/14/2020 | 444 | 248 | 14 |
|---|---|---|---|

COVID-19 kills the sick and elderly at heartbreaking rates. Since January 2020, COVID-19 has spread widely in the United States. It is detected in all 50 states, the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands. *See* CDC, COVID- 19 Cases in the US, available at https://www.cdc.gov/coronavirus/2_019-ncov/cases-updates/cases-in-us.html.

COVID-19's death rate goes up 1) the older you are and 2) the sicker you are.  The death rate increases dramatically with age.  The best current evidence is that people aged 10-39 years are roughly 0.2% likely to die from COVID-19 (still a mortality rate double the influenza mortality rate).

Then it starts going up:

| Age | Case Fatality Rate |
|---|---|
| 60-69 years old | 3.6% |
| 70-79 years old | 8% |
| 80+ years old | 14.8% |

COVID-19's comorbidity death rate is frightening. Across all age groups, COVID- 19 kills:

| Condition | Case Fatality Rate |
|---|---|
| Cardiovascular disease | 13.2% |
| Diabetes | 9.2% |
| Hypertension | 8.4% |
| Chronic respiratory disease | 8% |

This information derived from analysis of death in Hubei Province, China.

In Wuhan, of the hospitalized population who ended up dying from COVID-19, 48% of them had hypertension, 31% had diabetes, and 24% had coronary heart disease. *See* Fei Zhou et al., Clinical course and risk factors for mortality of adult inpatients with COVID- 19 in Wuhan, China: a retrospective cohort study, Lancet (Mar. 11, 2020), available at

https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30566-3/fulltext.

Given the fact that the Mr. Marulanda Trujillo suffers from heart disease, hypertension, hyerlidemia, and coronary heart disease, he faces a substantial likelihood of death in the event he contracts the corona virus. Rather than wait until he does so, the present facts provide a compelling predicate to request compassionate release.

## RELEASE PLAN IF PRAYER FOR RELIEF IS GRANTED.

If this Court grants Mr. Marulanda Trujillo's emergency motion, he will quarantine himself for 14 days in Fort Lauderdale, Florida, where he will stay with close family friends, and he will thereafter forthwith self-deport to his native country of Colombia.

Based upon the foregoing, Mr. Marulanda Trujillo respectfully requests this Honorable Court to grant the instant Emergency Motion for Compassionate Release, and to further order the following:

1. Mr. Marulanda Trujillo's sentence of imprisonment should be reduced to time served, followed by five years of supervised release, including, as an additional special condition of supervised release, a period of 14 days of quarantine that are to be completed in Miami, Florida, before Mr. Marulanda self-deports.   Mr. Marulanda Trujillo will self-quarantine in Fort Lauderdale, Florida, with close family friends, the residence address will be disclosed to U.S. Probation, the government, and the Court prior to his release.

2. The Federal Bureau of Prisons should be directed by this Honorable Court to release Mr. Marulanda Trujillo immediately after the United States Probation Office approves his release plan.

## CONCLUSION, CERTIFICATE OF CONFERENCE AND EXHAUSTION.

The undersigned has not had an opportunity to discuss this motion with the DOJ prior to its filing.  On June 14, 2019, the Warden at Fort Dix declined Mr. Marulanda Trujillo's request for compassionate release. **(Ex. 8)** Consistent with governing law, the BOP is not the final word and

22

Mr. Marulanda could during the pendency of any appeal.

Respectfully submitted,

*/s Alvin E. Entin*

ALVIN E. ENTIN, ESQ.

Fla. Bar No: 127027

E-mail: aentin@hotmail.comm

ENTIN LAW GROUP, P.A.
633 S. Andrews Avenue, Suite 500
Ft. Lauderdale, Florida 33301

Tel: (954) 761-7201

Fax: (954) 764-2443

**Attorney for Defendant**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of April, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Filing.

*/s/ Alvin E. Entin*

Alvin E. Entin, Esquire

7